# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
## WESTERN DIVISION

ADAM HOOVER,

                                                  Case No: 1:16-cv-810

                Plaintiff,                        Dlott, J.

      v.                                              Bowman, M.J.

CHIPOTLE MEXICAN GRILL, INC.,

                Defendant.

## REPORT AND RECOMMENDATION

Plaintiff Adam Hoover, through counsel, filed this action against his former employer, Chipotle Mexican Grill, Inc. ("Chipotle"). Plaintiff's complaint alleges that he was wrongfully terminated from Chipotle on March 28, 2015. (Doc. 23). Chipotle's motion for summary judgment has been referred to the undersigned for initial consideration. For the following reasons, I now recommend that Chipotle's motion be GRANTED IN PART and DENIED IN PART.

### I.    Standard of Review

In a motion for summary judgment, a court must view "the facts and any inferences that can be drawn from those facts…the light most favorable to the nonmoving party." *Keweenaw Bay Indian Comm. v. Rising*, 477 F.3d 881, 886 (6th Cir. 2007) (internal quotation marks omitted). "Summary judgment is only appropriate 'if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.' " *Id.* (quoting Fed.R.Civ.P. 56(c) (internal quotation marks omitted). "Weighing of the evidence or making

credibility determinations are prohibited at summary judgment - rather, all facts must be viewed in the light most favorable to the non-moving party." *Id.*

The requirement that facts be construed in the light most favorable to the Plaintiff, however, does not mean that the court must find a factual dispute where record evidence contradicts Plaintiff's unsupported allegations. If a moving party has carried its initial burden of showing that no genuine issues of material fact remain in dispute, the burden shifts to the non-moving party to present specific facts demonstrating a genuine issue for trial. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986). "The 'mere possibility' of a factual dispute is not enough." *Mitchell v. Toledo Hosp.*, 964 F.2d 577, 582 (6th Cir. 1992) (citing *Gregg v. Allen-Bradley Co.*, 801 F.2d 859, 863 (6th Cir. 1986)). In order to defeat the motion for summary judgment, the non-moving party must present probative evidence that supports its complaint. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249-50 (1986). Although reasonable inferences must be drawn in favor of the opposing party, *see Matsushita*, 475 U.S. at 587, inferences are not to be drawn out of thin air. To demonstrate a genuine issue, the opposing party "must do more than simply show that there is some metaphysical doubt as to the material facts.... Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.' " *Id.*, 475 U.S. at 586-587 (citation omitted).

To the extent that Chipotle has shown that Hoover lacks evidence on an essential element of any of his claims, the burden shifts to Hoover to set forth "specific facts showing that there is a genuine issue for trial." *Matsushita*, 475 U.S. at 587. At this point, Hoover may not rely solely on his subjective beliefs or opinions. *Arendale v. City of Memphis*, 519 F.3d 587, 601 (6th Cir. 2008). He may not show only that some

hypothetical doubt exists as to the facts, *Matsushita*, 475 U.S. at 586. "The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." *Copeland v. Machulis*, 57 F.3d 476, 479 (6th Cir. 1995). Based on the relevant standards, the Defendant is entitled to judgment as a matter of law on four of Plaintiff's seven claims.

## II.     Findings of Fact[1]

Plaintiff, a homosexual male, lives with his mother and two younger siblings. Plaintiff testified to being bullied at school, both in high school and later in college, because of his sexual orientation. While still in high school, Plaintiff became the primary breadwinner for his family. In the fall of 2012, after graduating from high school, he enrolled in Miami University. In 2013, he was admitted to Miami University's Farmer School of Business.

On October 1, 2013, while still attending college full-time, Plaintiff began working for Chipotle as a crew member at the Harrison location. In January 2014, Hoover was promoted to Take-Out Specialist. In March 2014, shortly after Hoover made a complaint through Chipotle's Respectful Workplace hotline about a former employee he observed at the Harrison location, he was transferred to the Bridgetown location.

Hoover was well liked by all employees at the Bridgetown store and was qualified at all positions. In early 2015, Matt Kimball became the General Manager at the Bridgetown store. Chance Nathanson was the Area Manager. Kimball and/or Nathanson selected Plaintiff to be a Kitchen-Manager-in-Training in early February

---

[1]The findings of fact are drawn primarily from undisputed facts acknowledged by both parties. Where there are factual disputes, inferences have been construed in Plaintiff's favor for the purpose of the pending motion for summary judgment.

2015.

Soon after, in late February 2015, Hoover experienced an incident of bullying at college.  On March 2, 2015, Hoover worked a closing shift at the Bridgetown store. When he left Chipotle that evening, he intended to commit suicide.  Without informing anyone of his suicidal intention, he falsely posted on social media that he had been kidnapped and was trapped in the trunk of a car, and called 911 to report his situation ("the Incident").  Bridgetown co-workers alerted to the post gathered to search for him. He was later found and taken to the hospital by police after disclosing his suicidal ideation; he was released within a day.  Upon his release on March 3, 2016, he was diagnosed with "adjustment disorder with emotional disturbance."

Adjustment disorder is described as continued "feelings of stress, hopelessness, or worry" as a result of a "significant life-changing event," and usually lasts "less than 3 to 6 months." (Doc. 37-2 at ¶53).  The broad range of symptoms from the disorder can include hopelessness, suicidal thoughts, depression, anxiety, crying, and poor performance at school or work.  The disorder is treated with counseling, and sometimes medication.

Plaintiff was not prescribed any medications, but began seeing a mental health counselor on March 4.  He later pled guilty to a misdemeanor offense stemming from his false report relating to the Incident, and was sentenced to mandatory counseling and volunteer work.  Plaintiff remained in counseling for four months, until July 16, 2015.

Most of the Bridgetown employees knew of the Incident.  Hoover's mother told Kimball that Hoover had had a breakdown due to stress and a lack of sleep, which Kimball conveyed to Chance Nathanson and to Molly Johnson, the Assistant General Manager.  Johnson believed Hoover was exhausted and overworked.

After a week off from both school and work to recover, Hoover told Kimball that his counselor had advised that he could resume work, beginning on Friday March 13. Kimball requested a medical release before he returned to work; Hoover provided Kimball with a copy of his hospital discharge papers. Hospital records reflected a plan for Hoover to "take the week off work and school…, call for counseling today at Miami U…, decrease his work hours at Chipotle and pursue another job where he cannot work that many hours." (Doc. 37-11 at 15). As an accommodation for anxiety, his counselor also recommended that Hoover resume work in the back of the house because there had been a lot of media coverage about the Incident. Media outlets had been calling and "pressuring" Hoover to talk about the Incident.

Plaintiff testified that Kimball and Johnson began treating him differently upon his return to work. Hoover had texted Kimball that his counselor wanted him to "ease back in" and only work Friday, Saturday and Sunday when he first returned to work, which is what Kimball scheduled. (Doc. 37-16). However, Hoover asked for additional hours beginning on March 18 and during the following week, (*id.*), but Kimball did not want to schedule him full-time right away.

Twelve days after his return to work, on March 25, Hoover met at an Orange Leaf yogurt shop with Chipotle co-workers Hannah Kestermann (a Service Manager) and Amber Davis (a Kitchen Manager), as well as former Chipotle employee Michelle Meier. At Orange Leaf, Hoover stated that he "felt as though he was being shut out and…treated as fragile." (Doc. 37-13, Kestermann Dep. 47:3-7). Hoover also was concerned he was no longer on track to be promoted to Kitchen Manager, which would have included a raise. He expressed a desire to consult a lawyer concerning his employment rights, and asked Kestermann and Davis if they would "support him"

against Chipotle.  (Kestermann Dep. 52-54; Doc. 37-8, Kimball Dep. 42-43).

The next day on March 26, Kestermann reported the meeting to Kimball, including Hoover's beliefs that he was not "getting as many hours, and his [Kitchen manager] training had been delayed, and that he was being treated differently…as in not being given the usual tasks that he would be given…." (Kestermann Dep. 58:3-11; Kimball Dep. 39:11-14, 42-43).   Kestermann told Kimball and Johnson that Hoover wanted to hire an attorney. (Kestermann Dep. 59; Doc. 13-9, Johnson Dep. 78-79).

Kimball testified that he consulted with Nathanson, and told Nathanson that Hoover was gossiping, encouraging other employees to quit and join a lawsuit against Chipotle.  Kimball also told Nathanson that Hoover was going to try to get management fired. (Kimball Dep. 36-37; Kestermann Dep. 59:12-60:1; Johnson Dep. 80:2-6). Johnson and Kimball jointly agreed with Nathanson to terminate Hoover, but Nathanson was not there on March 28, 2015 when Kimball told Hoover he was fired.

### III.    Plaintiff's Claims

Plaintiff timely filed suit in this Court on August 3, 2016.   His complaint, as amended, alleges that he was terminated in violation of the Americans with Disabilities Act ("ADA"), as well as parallel Ohio laws (Counts I and II).  Plaintiff further alleges he was terminated in retaliation for protected activity under the same laws, (Counts III and IV), as well as in retaliation for exercising his rights under the Family and Medical Leave Act ("FMLA") (Count V).   In addition, Plaintiff alleges that Defendant intentionally discriminated against Plaintiff on the basis of his gender by treating him less favorably than similarly situated employees who conform to gender stereotypes (Count VI). Finally, Plaintiff alleges that Chipotle fired him in violation of Ohio public policy, in retaliation for expressing his desire to retain counsel to seek redress for alleged

unlawful activity (Count VII).

For the reasons stated below, I recommend that Defendant's motion for summary judgment be granted as to Counts I, II, V, and VI, but denied as to Counts III, IV, and VII.

## IV.    Analysis of Defendant's Motion

### A.  Hoover's ADA and related State Law Claims

Chipotle first argues that Hoover cannot maintain a disability discrimination claim because he is not "disabled," nor was he "perceived as disabled," as defined under either the Americans with Disabilities Act or Ohio's parallel statute, Ohio Rev. Code § 4112.02(A).  An individual has a "disability" if he has "a physical or mental impairment that substantially limits one or more major life activities," such as "seeing, hearing, eating, sleeping, walking, standing, lifting, bending, speaking, breathing, learning, reading, concentrating, thinking, communicating, and working." 42 U.S.C. §§ 12102(1)(A), (2)(A).  Under a separate provision of the ADA, an individual may also maintain a claim if he is "regarded as having such an impairment."  42 U.S.C. § 12102(1)(C).

### 1.  Insufficient Evidence of Disability In the Absence of "Substantial" Limitation in Concentration or Sleeping Prior To Termination (Count I)

Although an emotional or mental illness may fall within the definition of a disability under either the ADA or Ohio law, *see* Ohio R.C. § 4112(A)(16)(a), Defendant persuasively argues that Hoover's brief mental impairment did not qualify as a disability because it did not "substantially" limit any major life activity.  Hoover never sought or received any mental health treatment prior to the Incident, was diagnosed upon his admission to the hospital with "adjustment disorder," and remained in counseling for

7

only four months after the Incident.

Congress amended the ADA in 2008 to clarify that the "substantially limiting" portion of the threshold determination of whether an individual suffers from a "disability" should not be overly onerous, but should be construed "in favor of broad coverage… to the maximum extent permitted by the terms of the ADA." 42 U.S.C. § 12102(4)(A); ADA Amendments Act ("ADAAA"), Pub. L. No. 110-325, § 2, 122 Stat. 3553 (2008); *see also* 29 C.F.R. § 1630.2(j)(1)(i).  In amending the ADA,

> Congress explicitly rejected a number of standards formulated by the Supreme Court, such as the requirement that the impairment be "permanent or long-term" to qualify as a disability under the ADA. 42 U.S.C. § 12102(4)(D) ("An impairment that is episodic or in remission is a disability if it would substantially limit a major life activity when active."); ADAAA § 2(b)(4) (stating that a purpose of ADAAA is to "reject ... standards enunciated by the Supreme Court in *Toyota Motor Manufacturing, Kentucky, Inc. v. Williams*, 534 U.S. 184, 122 S.Ct. 681, 151 L.Ed.2d 615 (2002)," which included the requirement that an impairment's impact be "permanent or long-term" to qualify as a "substantial limitation").

*Barlia v. MWI Veterinary Supply, Inc.*, 2018 WL 327448, at \*4 (6th Cir., Jan. 9, 2018)(holding that, despite being a close issue, plaintiff had presented sufficient probative evidence that her hypothyroidism without medication, which condition flared up intermittently, resulted in symptoms that substantially impacted major life activity).

Additional regulatory provisions further explain what constitutes a disability:

> (ii) An impairment is a disability within the meaning of this section if it substantially limits the ability of an individual to perform a major life activity as compared to most people in the general population. An impairment need not prevent, or significantly or severely restrict, the individual from performing a major life activity in order to be considered substantially limiting. Nonetheless, not every impairment will constitute a disability within the meaning of this section.

> (iii) The primary object of attention in cases brought under the ADA should be whether covered entities have complied with their obligations and whether discrimination has occurred, not whether an individual's

impairment substantially limits a major life activity. Accordingly, the threshold issue of whether an impairment "substantially limits" a major life activity should not demand extensive analysis.

....

(ix) The six-month "transitory" part of the "transitory and minor" exception to "regarded as" coverage in § 1630.15(f) does not apply to the definition of "disability" under paragraphs (g)(1)(i) (the "actual disability" prong) or (g)(1)(ii) (the "record of" prong) of this section. The effects of an impairment lasting or expected to last fewer than six months can be substantially limiting within the meaning of this section.

29 C.F.R. § 1630.2(j)(1).

Despite the ADA's broad view of "disability," Congress has maintained the requirement that an impairment must "substantially limit…a major life activity." To that extent, not <u>every</u> impairment will constitute a disability. Stated another way, "[a]lthough almost any impairment may, of course, in some way affect a major life activity, the ADA clearly does not consider every impaired person to be disabled." *Runkle v. Potter*, 271 F. Supp.2d 951, 962 (E.D. Mich. 2003)(quoting *Ryan v. Grae & Rybicki, P.C.*, 135 F.3d 867, 870 (2d Cir. 1998)).

The regulations make clear that certain physical and mental impairments will, as a matter of course, be considered to fall within the definition of a disability. *See, e.g.*, 29 C.F.R. §1630.2(j)(3)(iii)(defining "partially or completely missing limbs or mobility impairments requiring the use of a wheelchair" as "substantially limit[ing] musculoskeletal function," and listing "major depressive disorder, bipolar disorder, post-traumatic stress disorder, obsessive compulsive disorder, and schizophrenia" as "substantially limit[ing] brain function"). However, just as a broken leg cannot be equated to a missing leg, so too may a distinction be drawn between a short-term mental impairment from which an individual quickly recovers, and a major mental

disorder. On the record presented, Plaintiff has offered no evidence that he has been diagnosed with any major mental disorder, such as those that "in virtually all cases" are considered to substantially limit major life activities. *See* 29 C.F.R. § 1630.2(j)(3); *see also generally, Shaver v. Wolske & Blue*, 742 N.E.2d 164, 168, 138 Ohio App.3d 653, 660 (Ohio App. 10 Dist., 2000)(concluding that plaintiff who had a diagnosis of major depression and symptoms over 5 years had provided evidence of disability, differentiating between "normal depression which most people experience from time to time," and "major depression [which] is a serious medical disorder with both physical and psychological symptoms and is caused by the brain's inability to produce certain chemical neurotransmitters.").

Plaintiff's only diagnosis is "adjustment disorder" – and he did not receive that diagnosis until his brief hospital admission following the Incident. Prior to that day, he had received neither mental health treatment nor any diagnosis of any mental illness. His impairment caused only a brief absence from school or work, no more than would be typical for many brief physical illnesses such as influenza. Based on the lack of probative evidence that Plaintiff was "substantially limited" in any major life activity, he has failed to demonstrate that his adjustment disorder constituted a "disability" under the ADA. *Accord Myers v. Cuyahoga County, Ohio*, 182 Fed. Appx. 510, 515-516 (6th Cir. 2006)(affirming summary judgment based upon plaintiff's failure to show that she was disabled by adjustment disorder); *Quintle v. Medina County*, 2008 WL 2484173 (N.D. Ohio June 17, 2008)(insufficient evidence that adjustment disorder with mixed anxiety and depressed mood was within ADA definition of disability, where plaintiff nearly immediately released back to work without restrictions); *see also Scheerer v. Potter,* 443 F.3d 916, 920 n.2 (7th Cir. 2006)(references to sleep disturbance from

adjustment disorder, typically a short-term condition, were insufficient to show disability); *Veltri v. DFS Servs. LLC*, 2011 WL 3667447 at n.8 (generally discussing pre-2009 ADA case law that defines what is meant by "substantially limited" in a major life activity).

To support his claim that his adjustment disorder was sufficiently severe to constitute a "disability" as defined under the ADA and Ohio law, Plaintiff relies on modest evidence of sleep disturbance, and even more modest evidence of limitation in "concentration." With respect to the latter, the only evidence appears to be a single subjective report by Plaintiff in the emergency room that he "sometimes has difficulty [with concentration] due to lack of sleep." (Doc. 37-11 at 18). However, there is no other evidence that Plaintiff ever reported difficulties with concentration, or was observed as having such difficulties. Any claim that his impairment "substantially limits" concentration is also undermined by evidence of his high academic achievement, reportedly maintaining a 4.0 GPA while working more than 40 hours per week at Chipotle, and running a gay rights advocacy organization.

The evidence that Plaintiff's adjustment disorder "substantially" limited his sleep is similarly modest at best. Hospital records indicate that Plaintiff reported sleeping less well for 3-4 nights prior to the Incident due to his busy schedule, (Doc. 37-11 at 18), and that he reported some continued sleep disruption from nightmares a few days later on March 6, when he was still on leave from work. (Doc. 50-3 at 4). Plaintiff's evidence is insufficient to show that his mental impairment (as opposed to other reasons) caused his sleep disruption. Additionally, even if Plaintiff had stronger evidence that his adjustment disorder caused some disruption to his sleep, his evidence is not sufficient,

under controlling Sixth Circuit case law, to demonstrate that his adjustment disorder so substantially limited his sleep that it constituted a disability.

In *Neely v. Benchmark Family Servs.*, 640 Fed. Appx. 429 (6th Cir. 2016), the Sixth Circuit affirmed the grant of summary judgment where an employee had alleged sleep disturbance based on a physical disability, reasoning that:

> Our circuit precedent has consistently held that sleeping problems like Neely's—"getting only 2 to 3 hours of restful sleep per night, falling into micro sleeps during the day ... snoring, and extreme difficulty breathing while sleeping," Neely Br. at 14—fail to constitute a substantial limitation on a major life activity. *See Simpson [v. Vanderbilt University],* 359 Fed.Appx. at 567 (6th Cir.2009) (holding that the plaintiff's testimony that "he was sleeping three or fewer hours five days per week" did not constitute a substantial limitation); *Boerst v. Gen. Mills Operations,* 25 Fed.Appx. 403, 407 (6th Cir.2002) (holding that sleeping between two and four hours per night, "while inconvenient, simply lacks the kind of severity we require of an ailment before we will say that the ailment qualifies as a substantial limitation"); *see also Jones v. AKKO Fastener, Inc.,* No. 1:09–CV–286, 2010 WL 3365940, at *11 (S.D.Ohio Aug. 23, 2010) (accepting that the plaintiff suffered from sleep apnea, but noting that he "has evidently been able to function with sleep apnea since 1998. While sleep apnea may well constitute a disability for some individuals, [the plaintiff's] descriptions of the effects of his condition are insufficient to establish the level of severity required to qualify as a 'substantial limitation' on major life activities").

*Neely*, 640 Fed.Appx. at 434.

Notably, the *Neely* court considered the 2008 amendments to the ADA regulations, but held that existing Sixth Circuit precedent concerning what is meant by substantially limiting the major life activity of "sleeping" remains valid. Pointing out that Congress expressly chose to retain the "substantially limits" language, the court stated that "[a] lesser burden is a burden nonetheless" and that some medical evidence "must explain the duration or severity of the impairment," and that "self-described symptoms …[of sleep deprivation], without corroborating medical evidence or any diagnosis are insufficient to establish a substantial limitation on a major life activity." *Id.* at 434-435;

*accord Jennings v. Monroe County*, 2014 WL 6675277, at *9 (E.D.Mich., 2014)("While it is true that his medical records from Dr. Rizzo reveal that he had been experiencing trouble sleeping, this is insufficient under circuit precedent to establish substantial limitation in this major life activity."); *see also generally, Blosser v. AK Steel Corp.*, 520 Fed.Appx. 359, 366, 2013 WL 1316344, at *7 (6th Cir., 2013)(affirming summary judgment under ADA where employee returned to work without restrictions after treatment for brain tumor, holding that "even the potential need to take future medical leave to treat the ongoing condition does not necessarily indicate that Blosser had a disability under §4112 because he faced no work restrictions or substantial limits on any major life activity.")

As in the cases cited by *Neely*, and *Neely* itself, Plaintiff's evidence that his mental impairment substantially limited his ability to sleep is legally insufficient to demonstrate disability. Rather, Plaintiff's records reflect that he typically slept 3-4 hours per night, or up to 6 hours on a "good night" based not upon any mental impairment, but instead due to his taxing schedule of working full-time (or more) at Chipotle, attending school full-time, and being heavily engaged in volunteer work. (Doc. 37-11 at 6, "not sleeping due to being so busy," *see also id.* at 12-16 (report of working 40-50 hours a week at Chipotle, attending school full-time and maintaining a 4.0 grade point average, along with large amounts of volunteer work). Upon his discharge from the hospital, he was advised to take a week off from work and school, to pursue mental health counseling through Miami University, and to "decrease his work hours at Chipotle and pursue another job where he cannot work that many hours." (*Id.* at 15).

Plaintiff argues that his mental impairment was more limiting than the relatively benign diagnosis would suggest, because his "mental disorder built up over time, and

was not dispelled by a single night of despair" that culminated in the Incident. (Doc. 50 at 10). As evidence, Plaintiff points to testimony from Amber Davis that "everybody" believed that Hoover had "a mental illness of some sort." (Doc. 42, Davis Dep. 53). However, there is no evidence that anyone at Chipotle was aware that Hoover had any type of disability *prior to* the Incident. Davis testified only to her belief (and that of her coworkers) after the Incident that the Incident must have been the result of a mental impairment, "[b]ecause people actually went out and did the search," and "when he came back, there was a lot of talk." *Id.* Another co-worker testified that she was not aware of any mental health condition prior to the Incident, but did recall him being sleep-deprived due to working too many hours.

> "[H]e was very stressed out, like, at work during the weeks prior to that incident because of going to school and working, because I'm pretty sure he had more credit hours than I did and he was working more shifts than I was. And I was, like, boy, you need to get some sleep, you know.
>
> So when I found out that it wasn't, like, a kidnapping, I was just thinking he was sleep-deprived."

(Doc. 41, Depo of Cantrell at 38). Being sleep deprived for even a few weeks, due to a busy schedule, is not a recognized disability.

Plaintiff's reliance on the deposition testimony of former co-worker Michelle Meier that he had "anxiety and probably some depression," (Doc 37-17, Meier Dep. 33-34) is similarly unavailing. Meier testified that she was working toward her Masters in Social Work at the time of her deposition. In addition to being a former co-worker who had not worked at Chipotle since December 2014, more than two months prior to the Incident, Meier testified that her belief was based upon her educational training and Hoover's statements at a dinner *after* Hoover's termination. (*Id.*, Dep. 10, 31-33). Aside from the fact that she was a former co-worker who did not work with Hoover at the time of the

Incident, Meier testified that before the Incident, she believed only that he was feeling "overwhelmed" and "wasn't sleeping" and was "stressed" based upon his extremely busy schedule. (*Id.*, at 33-36).

Plaintiff's testimony that he had longstanding "issues" stemming from childhood bullying also is insufficient to show a disabling mental impairment, particularly where Plaintiff had never reported symptoms or sought any treatment. Plaintiff attempts to evade the import of his lack of any reported symptoms, diagnosis, or treatment by arguing that such facts are not "wholly dispositive," on whether he had a disability. (Doc. 50 at 9). However, there is simply no credible evidence of any mental impairment prior to the Incident. The lack of any reported symptoms, diagnosis, or treatment prior to the Incident, in combination with a lack of evidence of substantially limiting symptoms after the Incident, supports summary judgment on the issue of whether Plaintiff suffered from a disability.[2]

## 2.  No Evidence of Being "Regarded As" Disabled (Count II)

The ADA and Ohio's law protect not only those who have a mental or physical disability, but also protects those who are "regarded as having such an impairment." §12102(1)(C). Unlike the protection offered to those who can prove that they have a disability, the "regarded as" prong protects individuals regardless of "whether or not the impairment limits or is perceived to limit a major life activity." § 12102(3)(A). Thus, Hoover's inability to produce evidence that his adjustment disorder substantially limited his concentration or sleep does not preclude him from maintaining a claim under the

---

[2]Plaintiff's assertion that his feelings of hopelessness, flashbacks and sleep disturbance increased over the two-month period following the Incident (under his termination) cannot be used to prove that he was under a disability prior to his termination. Considering that all evidence suggested that any impairment was likely to be temporary, Chipotle cannot be held responsible for any alleged increase in symptoms after termination. *See generally Yarberry v. Gregg Appliances, Inc.*, 2014 WL 4639149 at **8-9 (S.D. Ohio 2014).

"regarded as" prong of the ADA.

On the other hand, as a matter of law, one cannot be "regarded as" disabled based upon "impairments that are transitory and minor. A transitory impairment is an impairment with an actual or expected duration of 6 months or less." § 12102(3)(B). By definition, adjustment disorder has an "expected" duration of 6 months or less.

There is no dispute that Chipotle was aware of the Incident, and was aware of his diagnosis of adjustment disorder arising out of the Incident. However, "awareness of an impairment is not enough to prove that the impairment was regarded as substantially limiting major life activities." *Wolfe v. U.S. Steel Corp.*, 567 Fed. Appx. 367, 374 (6th Cir. 2014); *see also Williams v. OmniSource Corporation*, 2018 WL 340154, at *9 (N.D.Ohio, 2018)(holding that "an employee's illness or incapacity does not automatically translate to a disability," and "employer's perception that health problems are adversely affecting an employee's job performance is not tantamount to regarding that employee as disabled.")(internal citations omitted).

Chipotle is also entitled to judgment on Plaintiff's "regarded as" theory because by definition, Plaintiff's "adjustment disorder" was a temporary or transient condition with an expected duration of 6 months or less. Hoover acknowledges that usual prognosis, but denies that his individual "prognosis was ascertainable at that time [March 3, 2015], with respect to the time frame and expected recovery." (Doc. 50-1 at ¶53). However, the fact that Hoover's individual prognosis may have been unknown at the time of his diagnosis and/or termination (just 15 days after his return to work) is arguably irrelevant given the expected duration of the typical "adjustment disorder." In any event, Hoover remained in counseling for his adjustment disorder for only four months, within the time frame of the "expected duration." Thus, as a matter of law, Hoover cannot succeed on

a "regarded as" disabled claim under the ADA. *See White v. Interstate Distrib. Co.*, 438 Fed. Appx. 415, 420 (6th Cir. 2011); *Blosser v. AK Steel Corp.*, 520 Fed. Appx. at 366 (dismissing discrimination claim under Ohio law where brain tumor was quickly resolved through treatment); *see also, generally, Kruger v. Hamilton Manor Nursing Home*, 10 F. Supp.3d 385 (W.D.N.Y. 2014)(broken arm did not qualify as "regarded as" disability due to expected duration of impairment); *Yarberry v. Gregg Appliances, Inc.*, 2014 WL 4639149 (S.D. Ohio 2014), *aff'd*, 625 Fed. Appx. 729 (6th Cir. 2015).

### 3. Chipotle's Knowledge of Alleged Disability

Chipotle further argues that even if Plaintiff's mental impairment could be viewed as a disability, or otherwise could satisfy the criteria for being "regarded as" a disability, Chipotle would still be entitled to judgment because the decision-maker (Kimball) had knowledge only of a temporary impairment. Because I have concluded that Plaintiff (1) had no actual disability, and (2) was not "regarded as" disabled based upon the temporary or transitory nature of his mental impairment, I decline to reach this alternative argument.

### 4. Retaliation for Opposing Disability Discrimination under ADA and Ohio law (Counts III and IV)

To establish a prima facie case of retaliation under the ADA, Hoover must show: (1) that he engaged in protected activity; (2) that Chipotle knew about his exercise of protected rights; (3) that Chipotle took adverse employment action against him; and (4) that there was a causal connection between the activity and his termination. *See Morris v. Oldham Cty. Fiscal Court,* 201 F.3d 784, 792 (6th Cir. 2000). Importantly in light of the foregoing analysis, a plaintiff need not be disabled in order to assert a claim of disability retaliation, so long as he has a reasonable, good faith belief that the opposed

act or practice is unlawful under the ADA. *Barrett v. Lucent Tech., Inc.*, 36 Fed. Appx. 835, 840 (6th Cir. 2002)(citing *Johnson v. Univ. of Cincinnati*, 215 F.3d 561, 579-80 (6th Cir. 2000)).

Hoover has put forth evidence that he arranged a meeting at an Orange Leaf yogurt shop to discuss his work grievances on March 25, 2015 with two Chipotle managerial employees, both of whom he considered to be friends. Complaining to management about suspected discrimination is a classic example of protected activity, although complaining to others about allegedly unlawful employment practices may also constitute protected activity. *See Johnson*, 215 F.3d at 579. Plaintiff was terminated soon after that meeting was reported to General Manager Kimball.

Chipotle argues that Hoover's complaints at Orange Leaf were too "vague" and were therefore "insufficient to constitute opposition to an unlawful employment practice." *See Fox v. Eagle Distrib. Co., Inc.*, 510 F.3d 587, 591-92 (6th Cir. 2007)(quoting *Booker v. Brown & Williamson Tobacco Co., Inc.*, 879 F.2d 1304, 1313 (6th Cir. 1989)); *see also generally Weaver v. Ohio State Univ.*, 71 F. Supp.2d 789, 793-94 (S.D. Ohio 1998)("[c]omplaints concerning unfair treatment in general which do not specifically address discrimination are insufficient to constitute protected activity."). However, the referenced cases are distinguishable. In *Fox*, for example, the plaintiff complained only that management was "out to get him," without reference to any perceived age discrimination. *Id.*, 510 F.3d at 592.

By contrast, Plaintiff here has provided sufficient probative evidence to defeat summary judgment on the retaliation claim. Hoover initially requested an accommodation, on the advice of his counselor, to resume work in the back of the house instead of at the front where he would have more public contact. At the Orange

Leaf meeting, Hoover specifically complained that Kimball and Johnson were treating him differently following the Incident,[3] including by reducing his hours and halting his KMIT progression. (Hoover Dep. 229-230; Kesterman Dep. 26, 47, 58; Meier Dep. 36-37). Hoover's comments clearly linked the difference in his treatment to his perception that Kimball and Johnson were responding negatively to his mental health impairment. Hoover complained that he was being treated as "fragile," and "wasn't going to get promoted because of his problems," and that management feared he "might have another incident," and that he was being discriminated against. (Kesterman Dep. 47-48, 58, 79). Kestermann and Hoover both stated that Hoover limited his discussion to concerns specifically about disability discrimination and his desire to seek legal advice to protect his employment rights. (Kestermann Dep. 51-54; Hoover Dep. 229-230). Meier testified that Hoover "felt discriminated against because of his mental health" because "people were treating him differently after it happened," and he wanted to pursue legal remedies. (Meier Dep. 42). He asked if the attendees at the Orange Leaf meeting would "support him" if he took legal action against Chipotle. (Kestermann at 52-54).

The day after the meeting, Kestermann informed Kimball of Hoover's complaints, including that Hoover complained that he was not being given sufficient hours, training, or given the same tasks based upon Chipotle's view that he "couldn't handle it" due to his mental impairment, and that he wanted to consult a lawyer about his rights. (Kesterman Dep. 58). Although the law may not entirely protect an employee's right to sue his employer over unspecified complaints, the ADA and corresponding Ohio law do

---

[3]On the record presented, the Incident is considered to be equivalent to the onset of Plaintiff's mental health impairment.

protect an employee's right to sue for disability discrimination.

Chipotle further argues that it had no knowledge of any protected activity, but the undersigned finds sufficient evidence on this issue to go to a jury. Chipotle admits that, on March 26, a number of employees told Kimball about the March 25 meeting, and the record suggests the issue was further discussed among management on March 27. Kestermann testified that she specifically reported that Hoover believed he was being discriminated against based upon the Incident and/or his mental impairment. Kimball's testimony - that he did not *interpret* Hoover's complaints to relate to disability discrimination, but instead viewed the complaints as threats against the Bridgetown management – does not exonerate Chipotle because a jury could find that explanation not to be credible or reasonable based upon the record as a whole.[4] In short, there is substantial evidence that Kimball decided to fire Hoover on March 28 as a result of the Orange Leaf meeting.

Last, the undersigned finds unpersuasive Chipotle's contention that Hoover cannot show the requisite causal nexus between his protected activity and his termination. To establish causation,

> a plaintiff must produce sufficient evidence from which an inference could be drawn that the adverse action would not have been taken had the plaintiff not [engaged in the protected activity]….Although no one factor is dispositive in establishing a causal connection, evidence that defendant treated the plaintiff differently from similarly situated employees or that the adverse action was taken shortly after the plaintiff's exercise of protected rights is relevant to causation.

*Nguyen v. City of Cleveland*, 229 F.3d 559, 563 (6th Cir. 2000)(internal citations omitted). The referenced evidence in this case is sufficient to draw that inference.

---

[4]The undersigned finds unpersuasive Chiptole's assertion that Hoover has only "hearsay evidence" that Kimball had knowledge of any protected activity (complaints about disability discrimination). Kestermann and other employees are competent to testify, as they did in their depositions, about what they related to Kimball.

Chipotle argues that Hoover is required to come forward with some type of "additional evidence of a causal connection" *after* the Orange Leaf meeting. *See Kirkland v. James*, 154 F. Supp.3d 608, 619 (S.D. Ohio 2015). Chipotle's argument is based upon its position that Hoover was terminated for a legitimate, non-discriminatory reason – that he was gossiping about other employees, and his behavior was "disruptive of the Bridgetown team." (Doc. 35-1 at 10-11).

The temporal proximity between the protected activity on March 25, the report to higher management of that activity on March 26, the alleged additional discussion on March 27 and Plaintiff's termination on March 28, all support the inference that Plaintiff's protected activity led directly to his termination. Chipotle may well have evidence of other reasons for the termination. However, in the context of the pending motion, all reasonable inferences must be drawn in favor of Hoover and not Chipotle. No other employees appear to have been terminated for similar conduct.[5] In addition, drawing all inferences in his favor, the evidence is sufficient to find that Chipotle's proffered reason for termination was pretextual, and that the real reason for termination was Hoover's protected conduct at the Orange Leaf meeting, including his plan to seek legal redress for perceived disability discrimination.

### B. Hoover's FMLA Retaliation Claim (Count V)

Unlike the evidence in favor of Hoover's retaliation claims under disability laws, Plaintiff's evidence on his FMLA retaliation claim is not sufficient to defeat summary judgment. The FMLA retaliation claim requires Hoover to show that he (1) engaged in a protected activity; (2) known to Chipotle; (3) that Chipotle took adverse action; and (4)

---

[5]Admittedly, the evidence of whether other employees engaged in similar conduct is somewhat weak, as discussed *infra*. However, Chipotle's articulated reason for terminating Plaintiff is also somewhat weak, given the evidence that he was fired in response to his comments at the Orange Leaf meeting.

that there was a causal connection between the FMLA protected activity and the adverse action.  *Tennial v. United Parcel Serv., Inc.*, 840 F.3d 292, 308 (6th Cir. 2016).  There is no dispute as to the first three elements, since Hoover's time off work can be characterized as FMLA leave, of which Chipotle was aware, and Chipotle fired Hoover 15 days after he returned from that leave.  However, Chipotle persuasively argues that it is entitled to summary judgment based upon Hoover's failure to show any "causal connection" between his use of FMLA leave and his termination.

Temporal proximity alone is rarely sufficient to establish the causal connection element of an FMLA retaliation claim.  *See Thompson v. Ameritech Advertising Servs.*, 40 Fed. Appx. 90, 93 (6th Cir. 2002).  Here, the temporal proximity between Hoover's use of FMLA leave and his termination is not sufficient to establish a retaliatory motive.  Glaringly absent from the record is any testimony (by Hoover or anyone else) to support any reasonable inference that Hoover was fired in retaliation for taking time off work.  In fact, it is undisputed that Hoover's co-workers and managers supported his taking time off from work (FMLA leave) to recover after the Incident.  (Kimball Dep. 135:13-22, 147:4-11).  Hoover himself maintains that he was terminated because he complained about Kimball at the Orange Leaf meeting, and/or because of Molly Johnson's discriminatory treatment toward him, not because he took time off.  (Doc. 37-2 at ¶103).

By Hoover's own admission, therefore, there is no causal connection and Hoover's use of FMLA leave was not a cause of his termination.  *Laughlin v. City of Cleveland*, 633 Fed. Appx. 312, 315 (6th Cir. 2015)(affirming summary judgment to the employer; holding that although a plaintiff need not show that FMLA retaliation was not the sole cause of his discharge, plaintiff had failed show that retaliation was one such cause); *accord Tilley v. Kalamazoo Cty. Rd. Com'n*, 654 Fed. Appx. 675, 684 (6th Cir.

2016).  Chipotle is entitled to judgment because there is no evidence at all that Chipotle terminated Hoover based upon his use of FMLA leave.  *See also Flagg v. Staples the Office Superstore East, Inc.*, 138 F. Supp. 3d 908, 917 (N.D. Ohio 2015).

Despite being entitled to judgment on the FMLA retaliation claim to the extent that Hoover alleges his *termination* was retaliatory, in his response to summary judgment Hoover advocates for a new "retaliation" claim based upon the alleged reduction in his hours during the two week period he was employed by Chipotle after his return to work on March 13.  Citing evidence that Kimball initially scheduled him for fewer hours than he worked prior to the Incident, Plaintiff argues for the first time that the reduction in hours should be viewed as retaliatory conduct.

A plaintiff cannot present new theories of his case in response to a motion for summary judgment.  *Bridgeport Music, Inc v. WMJ Music Corp.*, 508 F.3d 394, 400 (6th Cir. 2007).  In addition, even if this new claim were to be considered, no reasonable juror could find in his favor on the issue of causation.  Although Plaintiff now argues that "at no point did Hoover ask Defendant for fewer hours" upon his return, (Doc. 50 at 12, n.2), the record of texts between Hoover and Kimball clearly reflects a request to work "only" Friday, Saturday and Sunday during his first week back.  (Doc. 37-16 at 5).

Hoover:  Hey how are you

Kimball:  Hey I'm good how are you?

Hooever:  Give or take day by day.  I wanted to tell you I can work this week but not a lot.  My consular [sic] wants me to only do Friday, Saturday, and Sunday.  She said she will get you a note.  She told me to ease into work, but thinks I need to work to avoid negative thoughts.
I got two [counselors] working with me they want me to take it easy but get into life.  Are you okay with that?

Kimball:  Yes that's ok with me.  I was thinking maybe have you do prep those days until you've got yourself back into a normal routine.

(Doc. 37-16 at 5-7).

In addition to Hoover's request to return to work with a three-day schedule, the texts over the ensuing days reflect that Kimball was responsive to Plaintiff's request to work additional hours beyond those he was scheduled. Before Hoover made any request for more hours, on May 15, 2015, at 8:34 p.m., Kimball texted Hoover to see if he could come in to work an unscheduled shift to help "break down the front line" at closing. (Doc. 37-16 at 18). However, Hoover did not reply until the next morning, on March 16, with an apology for not seeing Kimball's request.

Following up on Kimball's request, on March 18, Hoover texted Kimball to ask if he would like extra help "tomorrow night and Friday with closing or opening…." (Doc. 37-16 at 19-20). Kimball responded positively the next day, stating "I totally forgot u texted me I would love some help tonight if you're able." (*Id.* at 20). Hoover replied, "I sure can but I'm right now driving to get my sister." (*Id.* at 21).

It is unclear whether Hoover worked any additional hours since the next text to Kimball on March 20, Hoover states: "Hey I wanted to say sorry I completely overslept. Not used to sleeping medicine. If you need help later let me know." (*Id.* at 22). On March 21, Hoover texted Kimball again "to say sorry for asking for hours. I know my schedule[']s not the easiest to work with. I promise if you work with me a little through [the] next 7 weeks I'll be yours all summer. I just need more hours or I'd be broke and I know that's a lot of people[']s issues. I just hate asking for them after I did mess up…." (*Id.* at 23-24). On the morning of May 23, 2018, Kimball texted Hoover with an offer of additional hours:

> I wanted to extend the offer to come help this afternoon/early evening. I
> am super behind on the schedule….and I really need to replace myself so

I can have my days off.  If you're interested let me know.

(*Id.* at   26-27).  When Hoover failed to respond, Kimball texted him again:  "Hey were u wanting to help?"  Hoover replied negatively, explaining "Sorry I had to go out to my [counselor] tonight I'm almost done." (*Id.* at 28).

## C.  Hoover's Gender Discrimination Claim (Count VI)

Hoover alleges gender discrimination based upon the fact that as a homosexual male, he does not confirm to gender "stereotypes about males and masculine behavior." (Doc. 23 at ¶97.  Plaintiff's amended complaint specifically alleges that his "crying and/or…*expressions of his sexual orientation* did not conform with [Chipotle's] beliefs and stereotypes about males and masculine behavior," and that "*sexual orientation discrimination* necessarily entails treating an employee less favorably because of his gender."  (Doc. 23 at ¶¶97-98, emphasis added). To the extent that his gender discrimination claim is premised on sexual orientation, however, Plaintiff concedes on summary judgment that sexual orientation is not an explicitly protected class under Title VII or Ohio R.C. §4112.

Rather than relying on sexual orientation more explicitly, as suggested by the allegations of his amended complaint, Plaintiff argues that his claim is focused on sex "stereotyping," which does fall under protection against gender discrimination.  *See, e.g. Smith v. City of Salem*, 378 F.3d 566, 573 (6th Cir. 2004); *Myers v. Cuyahoga Cty.*, 182 Fed. Appx. 510, 519 (6th Cir. 2006).  Hoover now argues that his termination was for "gossiping and spreading rumors" and that the stated reason of "gossiping" amounts to discrimination based on gender stereotypes.  As compared to the allegations in his complaint that describe crying and allegedly feminine "expressions of sexual orientation," Plaintiff's argument in opposition to summary judgment appears to assert a

new theory based on a newly identified alleged behavioral characteristic.

Even assuming that the newly articulated version of his claim is cognizable, however, Chipotle is entitled to judgment because Plaintiff has failed to come forward with sufficient probative evidence to support the claim.  Plaintiff's newest iteration is based upon Chipotle's assertion, supported by Kimball's testimony, that Hoover was terminated because his conduct was "detrimental" to the Bridgetown team in violation of Chipotle policy.  When asked for specifics on how Hoover's conduct violated the policy, Kimball testified that Hoover was engaged in "[t]alk, gossip, and propaganda," spreading rumors about Kimball, trying to make the Bridgetown management "look really bad," and "trying to get people to join his side and go against Chipotle."  (Kimball Dep. 36-37; 50: 1-14; *see also id.,* 41: 7-21; 42:24-43:3).  Johnson did not describe Hoover's detrimental behavior as "gossip," but instead testified that he was "insubordinate" and did not comply with the Respectful Workplace policy based on her view that meeting with co-workers at Orange Leaf to present concerns about the management team in place was dishonest and not "respectful" towards Kimball and her. (Johnson Dep., 72:5-15, 99-100; 127: 4-11).

Plaintiff first characterizes Kimball's testimony as stating that he was fired for "gossip," and then further interprets that characterization as gender discrimination. Plaintiff hypothesizes that gossip is a "normal feminine behavior," whereas "men's gossip transgresses stereotypical masculine behavior.  (Doc. 50 at 18).  He argues that "[i]in one sexist swoop, Defendant [through Kimball] construed Hoover's protected activity as 'gossip,' and then punished him for his nonconformity with socially-construed gender norms." (*Id.*)  Plaintiff acknowledges that "there is little case law on the gender stereotype at issue."  Thus, to support his premise that he was fired for nonconforming

gendered behavior, Plaintiff points to examples of "the female gossip" as "a familiar trope in film and literature." (Doc. 50 at 18 and n.8).

Chipotle is entitled to judgment on this novel theory on multiple fronts. First, the undersigned finds insufficient evidence that Plaintiff was terminated for a "nonconforming" behavior, or that when Kimball testified that Hoover engaged in "gossip," Kimball understood that to be a feminine trait. It is not inherently obvious that gossip is so strongly perceived as a feminine characteristic either by society in general, or by Chipotle management in particular, that a male engaging in that behavior would be considered to be gender non-conforming. The word "gossip" is defined in the on-line Merriam-Webster dictionary as "rumor or report of an intimate nature" or "chatty talk." https://www.merriam-webster.com/dictionary/gossip (accessed on April 12, 2018). The first example of "gossip" in a sentence in the same dictionary source uses a male pronoun: "**He** had been spreading gossip about his coworkers." (Emphasis added). To accept Plaintiff's argument, this Court would have to accept the premise that on any occasion when a communication is criticized as "gossip," the person making that characterization is conveying a strong gender stereotype associated with females, and further holds discriminatory animus toward any male whose communication falls within the same category.

In addition to that completely unsupported premise, Plaintiff has failed to offer any evidence that Kimball (or anyone else at Chipotle) viewed his alleged "gossip" in any way as gender non-conforming. In fact, in his proposed facts, Plaintiff asserts that employees of both genders, including *Kimball himself*, routinely gossiped. (Doc. 50-2 at ¶73). *Accord Revely v. Cincinnati State Tech. & Comm. Coll.*, 2014 WL 5607605, at *2 (S.D. Ohio Nov. 4, 2014)(plaintiff, who identified as lesbian, failed to produce any

evidence that defendant was motivated by her alleged gender nonconformity).

Somewhat oddly (at least in the context of his gender discrimination claim), Plaintiff argues that whether he engaged in the alleged "gossip" "remains a key disputed fact." (Doc. 50 at 18). However, the crux of his current gender discrimination claim is that he did engage in gender non-conforming gossip, or at least, that Defendant believed he engaged in such gossip, and that he was terminated for that specific non-conformity.

Finally, aside from the exceptionally weak support for the theory that firing a male for "gossip" constitutes gender discrimination, Plaintiff offers no evidence that any female employees exhibited substantially similar behavior but were not terminated. Kestermann and Davis were not similarly situated because they were managerial employees. Even if viewed as similarly situated, there is no evidence that they or any other female employee "gossiped" in any similar manner.

### D. Wrongful Termination as a Violation of Public Policy (Count VII)

Plaintiff's final claim is that his termination violated public policy under Ohio law. To make out his claim, Plaintiff must show: (1) a clear public policy exists (the clarity element); (2) the termination of the employee jeopardizes the public policy (the jeopardy element); (3) that the dismissal was motivated by conduct related to the public policy (the causation element; and (4) that the employer lacked a legitimate business justification for the dismissal (the overriding justification element). *See Collins v. Rizkana*, 73 Ohio St.3d 65, 69-70, 652 N.E.2d 653, 657-58 (Ohio 1995). "The clarity and jeopardy elements are questions of law, while the causation and overriding justification elements are questions of fact." *Hollar v. RJ Coffey Cup*, LLC, 505 F. Supp.2d 439, 454 (N.D. Ohio 2007).

Chipotle previously moved for reconsideration on Plaintiff's motion to file a second amended complaint to add a public policy claim, arguing that such a new claim was legally without merit. Chipotle specifically argued that Plaintiff could not satisfy the "clarity" element as a matter of law, because Plaintiff never actually consulted an attorney but only conveyed his intention to do so at the Orange Leaf meeting. Instead, Plaintiff did not act on that intention until after his termination. Defendant concedes that "terminating an employee for consulting an attorney regarding the merits of a suit that would affect the employer's interest is a violation of public policy in Ohio." *Chapman v. Adia Services, Inc.*, 688 N.E.2d 604, 610, 116 Ohio App.3d 534, 544 (Ohio App. 1997). Nevertheless, Defendant previously argued in opposition to Plaintiff's ability to file his second amended complaint, as it argues now on summary judgment, that there is no "clear public policy allowing an employee to mull over the idea of legal action without taking any affirmative steps in furtherance of his right to use and access the legal system." (Doc. 24-1 at 7).

In allowing Plaintiff to file his second amended complaint to add a public policy claim, the presiding district judge implicitly rejected Chipotle's argument that Hoover could not satisfy the "clarity" element of his claim because he had not yet met with counsel when he was terminated. The fact that the Court denied Chipotle's motion without discussion of the "clarity" issue is irrelevant; Chipotle's motion was based upon the identical "clarity" argument now presented. Thus, the undersigned recommends denying Chipotle's motion for summary judgment on this claim based upon the Court's prior ruling.

To the extent that Chipotle's "clarity" argument may be reconsidered on summary judgment, the undersigned finds it unconvincing. As support for a bright-line limit based

on whether an employee has actually met with counsel, Chipotle relies on other limits recognized by Ohio courts placed on an employee's right to sue his employer. *See, e.g., Taylor v. Volunteers of Am.*, 153 Ohio App.3d 698, 702-703, 795 N.E.716, 719 (Ohio App. 2003)(declining to extend policy to protect employees for filing <u>any</u> lawsuit, holding that it is not against public policy for employer to terminate employee who files an unjustified breach of contract suit); *see also Momchilov v. McIlvaine Trucking Int'l., Inc.*, 2010 WL 4978073 at *4 (N.D. Ohio Dec. 2, 2010)(distinguishing between Ohio public policy that protects an employee's right to vindicate a clear legal right against the employer, and the lack of any right to consult counsel about ousting the company management).

The cases relied upon by Chipotle all involve an employee's intention to sue his/her employer on grounds that are both unjustified, and are unrelated to any right (such as gender, age, or disability discrimination) that is independently protected by law. By contrast, Hoover conveyed his intention to consult a lawyer in order to pursue a claim for disability discrimination, a right that clearly is protected by both Ohio and federal law. Considering that Hoover was terminated within three days of stating his intention to consult counsel, the undersigned would find, as a matter of Ohio law, that Hoover has satisfied the "clarity" portion of his claim.

The undersigned further concludes that Plaintiff has offered sufficient evidence to submit to a jury on the causation element. Kestermann testified that she relayed Hoover's concerns that he was being treated unfairly based upon the Incident and his perceived mental fragility, and that he was planning to consult a lawyer, to both Kimball and Johnson. (Kestermann Dep. 59-61; Johnson Dep. 78-79). Kimball admitted he was concerned that Hoover might sue Chipotle after his termination. (Kimball Dep. 55).

Although the undersigned finds that Plaintiff overemphasizes Kimball's testimony by taking it out of context, and that the issue is somewhat close, a reasonable juror could draw the inference that concern over Hoover's intention to sue Chipotle was a motivating factor in his termination.  For much the same reasons, there is sufficient evidence to present to the jury that Chipotle's stated reason for the termination (that Hoover was detrimental to the team) was not an overriding legitimate business justification, but was instead a pretext for firing him based upon his intention to seek legal redress for perceived disability discrimination.

### E.  Punitive Damages

The issue of punitive damages is particularly close.  Defendant argues that the Court should grant summary judgment in its favor on this claim, because Hoover can recover punitive damages only if he can show that Chipotle engaged in a discriminatory practice "with malice or reckless indifference to the federally protected rights of an aggrieved individual."  42 U.S.CV. § 1981a(b)(1).  Similarly, under state law, a plaintiff must show by clear and convincing evidence that the defendant acted with "malice or aggravated or egregious fraud."  Ohio R.C. §2315.21(C)(1).  There is no evidence that Kimball or anyone else at Chipotle acted with "malice" toward Hoover's protected rights.  Hoover was not under a disability, nor was he regarded as having a disability, under the ADA or Ohio law.

Still, the record suggests that Chipotle may have been recklessly indifferent to Hoover's right to articulate his concerns that Chipotle was infringing upon his disability rights, and equally indifferent to Plaintiff's right to consult counsel about those concerns.  To that extent, the undersigned recommends denying Defendant's motion for judgment on the punitive damage claims at this time, but without prejudice to renew that motion at

trial, depending on the evidence presented.

**V.      Conclusions and Recommendation**

Accordingly, **IT IS RECOMMENDED THAT** Defendant's motion for summary judgment (Doc. 37) be **GRANTED IN PART**, with judgment to be entered in favor of Chipotle on Counts I, II, V, and VI.  In all other respects, the motion should be DENIED, and this case should be set for trial on all remaining claims.


*s/ Stephanie K. Bowman*
Stephanie K. Bowman
United States Magistrate Judge

ADAM HOOVER,

                                         Case No: 1:16-cv-810

               Plaintiff,                      Dlott, J.
    v.                                   Bowman, M.J.

CHIPOTLE MEXICAN GRILL, INC.,

              Defendant.

## NOTICE

Pursuant to Fed. R. Civ. P. 72(b), any party may serve and file specific, written objections to this Report & Recommendation ("R&R") within **FOURTEEN (14) DAYS** of the filing date of this R&R. That period may be extended further by the Court on timely motion by either side for an extension of time. All objections shall specify the portion(s) of the R&R objected to, and shall be accompanied by a memorandum of law in support of the objections. A party shall respond to an opponent's objections within **FOURTEEN (14) DAYS** after being served with a copy of those objections. Failure to make objections in accordance with this procedure may forfeit rights on appeal. *See Thomas v. Arn,* 474 U.S. 140 (1985); *United States v. Walters,* 638 F.2d 947 (6th Cir. 1981).